**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **BRIAN A. ROGERS**, an individual<br>20316 Ocean Forest Court<br>Ashburn, VA 20147<br><br>*Plaintiff*,<br><br>*v.*<br><br>**CHRISTOPHER J. DONATELLI**, an individual<br>3031 Gates Road, NW<br>Washington, DC 20008<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. _____________** |

## COMPLAINT

Plaintiff Brian A. Rogers ("Rogers" or "Plaintiff"), by and through undersigned counsel, brings this complaint against Defendant Christopher J. Donatelli ("Donatelli" or "Defendant"), alleging the following.

## NATURE OF ACTION

1. Rogers brings this action against Donatelli for fraud, conversion, breach of contract, and breach of fiduciary duties under D.C. Code § 29-804.09.

2. Donatelli has exercised his power as the controlling individual and interest holder in a group of real estate development companies and special purpose entities to extract large sums of money for no legitimate business purpose or benefit to those enterprises. Instead, his activities were designed to (and did) benefit himself and his cronies.

3. Donatelli managed this self-enrichment through a shell game of transfers between related entities recorded as "loans" he never intended to pay back, "distributions" to partners who never received them, and cash outflows which explicitly violated the terms of the entities' operating agreements.

4. The key entity in this action is Kenyon Square North, LLC ("KSN"), which owns multiple street-level retail units and commercial parking spaces of the Kenyon Square Condominium building located at 1390 Kenyon Street, NW, Washington, DC 20010.

5. Rogers holds an interest in KSN through his membership in an employee participation account entity ("DKEPA #30"), which owns a 40% membership interest in KSN.

6. Between 2007 and the present, Donatelli has used his role as Manager of KSN to deprive DKEPA #30 of millions of dollars in distributions and capital value, while using the same role and his role as DKEPA #30's Manager to conceal this malfeasance.

7. Donatelli's withholding of distributions from DKEPA #30 and its Members violated the provisions of KSN's Operating Agreement (the "KSN Agreement") requiring proportionality of distributions among KSN's interest holders.

8. The countless transactions Donatelli effectuated as KSN Manager to his own benefit (described in greater detail below) violated the single purpose entity provisions of the KSN Agreement.

9. In numerous instances, Donatelli siphoned away cash funds intended for KSN and its Interest Holders, constituting conversion of such funds.

10. To conceal such activity, Donatelli caused DKEPA #30 to file multiple tax returns with the IRS containing false accounting information and, in doing so, violated his fiduciary duty of care to DKEPA #30.

11. All of the activity described herein constituted abuse of Donatelli's control over the group of related entities for his own benefit and that of his cronies, constituting a breach of his fiduciary duty of loyalty to Rogers as a DKEPA #30 Member.

12. All of the activity described herein had a cumulative, substantial negative effect on the value of Rogers' interest in KSN and the monetary benefit (or lack thereof) he received from such interest. Donatelli had a duty to report such activity, and his knowing concealment constituted a material misrepresentation to Rogers, on which Rogers relied to his detriment, *i.e.* fraud.

## THE PARTIES

13. Rogers is an individual and a Virginia resident.

14. Donatelli is an individual. On information and belief, Donatelli is a District of Columbia resident.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this matter under 28 U.S.C. § 1332, as Defendant is a citizen of the District of Columbia, Plaintiff is a citizen of a foreign jurisdiction—Virginia, and the amount in controversy exceeds $75,000.

16. Under 28 U.S.C. § 1391, venue is proper in this Court as the Defendant resides in the District of Columbia, and the events giving rise to Plaintiff's claims occurred in the District Columbia.

## STATEMENT OF FACTS

### I. Background

17. Rogers is an employee of Donatelli & Klein, Inc. ("D&K"), trading as "Donatelli Development," a real estate development company registered and doing business in the District of Columbia. Rogers has been employed with D&K since 1996.

18. D&K oversees real estate development projects through various special purpose entities, such as KSN.

19. Donatelli controls D&K and all its affiliated project entities through his ownership of D&K, as well as in his role as President and CEO. Donatelli further controls all the limited liability entities relevant hereto via his role as manager or managing member of each.

20. Through his ownership of D&K, Donatelli also has the most to benefit from unsupervised transfers by project entities to D&K.

*A. KSN*

21. KSN is a limited liability company organized under District of Columbia law on or about September 14, 2006. The Members of KSN executed the KSN Agreement on or about May 31, 2007.

22. KSN Agreement § 5.1.1 appoints Donatelli as the Manager of KSN.

23. Alongside DKEPA #30's 40% membership interest in KSN, Donatelli owns a 30% membership interest in KSN, as does one Vance Gragg, who owns the remaining 30% interest.

24. Apart from Members, the KSN Agreement defines an "Interest Holder," such as Rogers, as "an unadmitted assignee of a Member," such as DKEPA #30.

25. Under KSN Agreement § 4.1.1, the Manager (Donatelli) was responsible for distributing KSN cash flow and proceeds "among the Interest Holders in proportion to their respective Interests." The same section also required the Manager to "use reasonable efforts to distribute enough Operating Cash Flow on an annual basis to cover the income tax obligations of the Members for such year that arises as a result of the Company's allocation of any items of income or gain."

26. The KSN Agreement defined "Operating Cash Flow" as taxable income for Federal income tax purposes subject to certain adjustments and expenses, including reductions for "payments upon the principal of any loans, mortgages or any other [KSN] obligations."

27. The KSN Agreement also provided for the distribution of "Net Financing Proceeds" and "Net Sales Proceeds." It defined "Net Financing Proceeds" as remaining proceeds available following placement or re-financing of a mortgage on the Property, after allocation of reserves and payment of expenses. Similarly, "Net Sales Proceeds" are the remaining proceeds available following a sale of any portion of the Property, after allocation of reserves and payment of expenses.

*B. DKEPA #30*

28. DKEPA #30 is a limited liability company organized under District of Columbia law on or about March 15, 2007.

29. The purpose of DKEPA #30's organization was as an alternative form of compensation to certain employees, to share in the profits and cash generation of various real estate developments managed by the Donatelli-controlled group.

30. DKEPA #30 is one of several employee participation account entities organized for the benefit of D&K employees.

31. Under the Resolution of DKEPA #30, LLC, Rogers is an original DKEPA #30 Member, owning a 25% interest. Donatelli also had an original 1% share in DKEPA #30.

32. As a result of Rogers' 25% ownership of DKEPA #30, which in turn owns a 40% interest in KSN, Rogers holds a 10% interest in KSN, providing him certain rights as an Interest Holder under the KSN Agreement.

33. The Resolution of DKEPA #30 also provided for the sole and exclusive management of DKEPA #30 by Donatelli.

*C. The Kenyon Square North Retail Property*

34. Soon after its Members executed the KSN Agreement, KSN began operations on or about June 9, 2007, when it effected the purchase of the core retail and parking property at 1390

Kenyon Street, referred to in the KSN Agreement as the "Property." The purchase price for the Property was $8,827,400.

35. To finance the closing of this purchase, KSN took a loan from Anglo Irish Bank ("Anglo Irish"), which KSN and Anglo Irish finalized on or about June 29, 2007. The Anglo Irish loan provided for a facility of $12.12 million, the initial disbursement of which covered the price of the Property.

36. The Property consisted of eight retail bays and 41 parking spaces for rental to monthly-paying tenants.

37. Cash flows for the Property were net positive by 2008, including after debt service on the Anglo Irish loan.

## II. Donatelli's Drains on KSN's Finances

### *A. KSN Overburdened with Debt*

38. Despite KSN's positive cash flow throughout all but the first months of its operations, Donatelli caused the business to take on additional debt. This debt initially came in the form of loans from entities controlled by individuals who were close associates of Donatelli and/or partners on other business projects.

39. Section 2.3 of the KSN Agreement designates the company as a "Single Purpose Entity," placing certain restrictions on KSN's ability to transact business and manage accounts. KSN Agreement § 2.3(iv) prohibits KSN from entering into any contract or agreement with any related party, "except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties not so affiliated with itself or such Related Parties."

40. KSN Agreement § 2.3(v) prohibited KSN from incurring any new loan debt.

41. In or around July 2009, KSN received a loan from Clover Investment Group, LLC, an entity controlled by Donatelli's friend James Sullivan, to encumber KSN with $2 million at 20% daily compounding annual interest. There was no business need for this loan, which often cost KSN over $30,000 per month and more than the debt service on the Anglo Irish loan.

42. Section 2.3(i)(b) of the KSN Agreement limited KSN to ownership and management of the Property, but the agreement with Sullivan recited, "Whereas Donatelli desires to pursue new development investments in the greater Washington, D.C. area, and Donatelli and Kenyon North desire that Clover advance to Donatelli certain funds to facilitate such development."

43. The loan agreement named Donatelli and KSN together as the "borrower," but only Donatelli's purposes and receipt of funds were acknowledged in this recital. In other words, this was a loan for Donatelli's purposes but for which KSN bore the liability of interest.

44. On information and belief, KSN rapidly dispensed the proceeds of the July 2009 loan in full to non-KSN purposes, such as $560,000 to another Donatelli-controlled entity, Columbia Heights Venture Parcel 26, LLC.

45. On information and belief, another $100,000 went to Donatelli himself, possibly for the purpose of repaying a loan (not a loan incurred by KSN), $100,000 went to Nigel Gragg, and another $80,000 went to Donatelli's brother-in-law Billy Kappaz, all for unknown reasons.

46. In or around December 2011, KSN executed a Promissory Note with James McReady, another personal friend of Donatelli, for $3 million at 11% annual interest. This loan paid off the loan from Clover Investment Group but incurred further extravagant interest, and its proceeds went to little or no ordinary course of business expenses of KSN.

47. In or around August 2016, Mr. McReady issued another promissory note to KSN for $1,750,000, at 11% interest. As recorded by KSN's general ledger, nearly all the proceeds of this loan went almost immediately to Donatelli or D&K.

48. Some proceeds were recorded as distributed to DKEPA #30, but none were.

49. Because Donatelli's encumbrance of KSN had deprived the business of its ability to service the Anglo Irish loan debt, the resulting liability had to be re-financed multiple times.

50. On or about June 1, 2012, KSN agreed to an $11.75 million loan from TD Bank at an approximate 3.65% annual percentage rate of interest.

51. Ever increasing its leverage, on or about December 22, 2015, KSN received a $16,500,000 loan from United Bank at an approximate annual rate of 4.15%, to pay off the by then $12.093 million balance on the loan from TD Bank.

52. The United Bank Loan balance also covered the "Payoff of Second Mortgage Loan, Mezz Loan for Kenyon Square No[rth]" in the amount of $3,558,587.79, *i.e.*, the 2011 McReady loan, which had a $3,514,529 balance as of December 1, 2015.

53. On or about October 29, 2020, KSN received a $16,500,000 loan from Sandy Spring Bank for the "Payoff of First Mortgage Loan," at approximate annual interest of 7.39%. Finally, on or about June 10, 2021, KSN and Sandy Spring Bank modified the Sandy Spring Bank Loan to increase the balance by $350,000.

54. On information and belief, from 2009 to the present, KSN has incurred or accrued approximately $6 million in debt service over the amount that would have been required to pay off the original Anglo Irish loan without unnecessary loans from Donatelli's friends and subsequent re-financings.

*B. KSN Dispensed of Millions in Cash in False "Loans."*

55. Since its inception, KSN has frequently dispensed cash under the guise of "loans," which has served to obscure the true state of KSN's financial condition.

56. On or about July 5, 2007, almost immediately upon closing of the Anglo Irish Bank loan that financed KSN's acquisition of the Kenyon Square Condominium, KSN "loaned" D&K $600,000.

57. In a D&K QuickBooks export for an account labeled "Loan Payable -- Kenyon Sq North," there is a $600,000 transaction entry. In line with that loan payable entry is an explanatory note, "$200,000 Vance $200,000 CJD $70,000 Payroll $40,000 Sarah's Circle $90,000 payables."

58. On information and belief, "CJD" stands for Christopher J. Donatelli.

59. On information and belief, Donatelli transferred $600,000 out of KSN under the guise of a "loan" and kept $200,000 for himself.

60. Based on KSN and D&K's accounting records, and on information and belief, D&K's *recorded* liabilities to KSN reached $3,552,364.15 by February 2011 and $4,150,569.81 by October 2021.

61. By the end of 2012, KSN's balance sheet recorded a "Loan Receivable – D&K" of $2,408,598.54 in Current Assets. But, effectively cancelling that asset, a Current Liability line for "Distribution to D&K Partner" of $2,573,334 appears that same year. To Rogers' knowledge, no other Member was admitted to the KSN partnership, so this distribution has no basis in the rights or authorizations provided in the KSN Agreement. This liability therefore has no basis except artificially depress KSN's receivables.

62. On information and belief, D&K incurred little to none of this liability balance on trade credit in ordinary course of business transactions or in loans evidenced by repayment terms or any other typical loan documentation.

63. On information and belief, D&K (controlled by Donatelli) never had any intent of repaying these liabilities, and KSN (controlled by Donatelli) never had any intent of pursuing repayment.

64. Over the course of more than a decade, this balance only grew to the millions itself, disproving any intent of the joint controller of both entities (Donatelli) for KSN ever to receive these liabilities back, let alone with interest.

65. The size of this balance cannot be understated in importance. The original value of the Property and, hence, of the original Anglo Irish disbursement was approximately $8.8 million—a little over twice the amount D&K siphoned away from KSN over the years. Incomes from the Property's retail tenants were more than sufficient to pay the monthly debt service on the Anglo Irish loan from 2008 onward.

66. Without the pointless, unaccountable outlay of more than $3.5 million in cash to D&K by 2011 and at least $6 million in debt service on loans KSN took out *beyond* what servicing the Anglo Irish loan would have required, KSN would have had significant positive Operating Cash Flow from 2008 onwards. Such cash flow would have been available for distribution to Members, but as discussed below, distributions to DKEPA #30 were sparse.

67. KSN further made numerous other such outlays to other entities controlled by Donatelli under the guise of loans.

68. The foregoing supposed "loans" were false in the sense of being genuine assets to KSN/genuine liabilities to the other Donatelli-controlled entities but real in that they actually reduced KSN's available cash.

69. Because KSN frequently paid real cash interest on actual loans incurred (under exorbitant terms) without receiving actual interest income on the "loans" made to Donatelli-controlled entities, KSN regularly reported annual income statement losses, despite the productivity of the underlying Property.

70. On information and belief, Donatelli caused KSN to file tax returns to the IRS, which recorded assets and liabilities based on the above-described faulty accounting, which Donatelli knew to be faulty because he controlled both sides of each fabricated "loan" transaction.

## III. Unpaid, False, and Converted Distributions

### *A. KSN Reported Distributions to DKEPA #30 on Tax Returns That Went Unpaid.*

71. As Manager of KSN, Donatelli regularly made cash distributions to himself as a KSN Member and KSN's other Members Nigel and Vance Gragg, out of proportion to distributions made to DKEPA #30.

72. Donatelli then caused KSN to report a much higher distribution to DKEPA #30 on its tax returns than was actually paid out.

73. For example, in 2011, KSN reported a capital account withdrawal of $4,233,334 in its 2011 tax return, of which $1,693,334 was a reported distribution to DKEPA #30.

74. KSN only distributed cash of $200,000 to DKEPA #30 in 2011. As a 25% interest member of DKEPA #30, Rogers only received $50,000. Rogers would have received $423,333.50 in 2011 if this report had been accurate.

75. On information and belief, in 2011 KSN made $635,000 in actual cash distributions to each of Nigel and Vance Gragg, which was proportionate to their interests.

76. On information and belief, Donatelli caused KSN to distribute his proportionate share as a 30% KSN Member in actual cash throughout the year.

77. On information and belief, KSN made $560,000 of those $635,000 in distributions to each of Nigel and Vance Gragg in April 2011, while the $200,000 distributed to DKEPA #30 was distributed on or about December 15, 2011.

78. Because under KSN Agreement § 4.1.1, distributions were supposed to be proportionate and based on available cash flow and sales and financing proceeds, there was no reason for cash distributions within a year to be made eight months apart to different KSN Members.

79. Even if the remaining $1,493,334 of the 2011 distribution reported to DKEPA #30 were recorded as a liability, under KSN Agreement § 4.1.1 there was no reason for one Member's distribution to be entirely in cash while another's was mostly in the form of a receivable.

80. This indicates that Donatelli made distributions to the Graggs in April, with whom he had a more equitable relationship than that with his employees, then to himself, and at year's end realized the disproportion of these distributions and reported a proportionate distribution to DKEPA #30 he had no intent to make.

81. DKEPA #30 has never received a distribution of the remaining $1,493,334 from 2011. This is likely to have caused substantial false reporting in KSN, D&K, and DKEPA #30's accounts and, therefore, their tax returns.

82. On information and belief, at or around the 2017 calendar year end, Donatelli cancelled approximately $1,078,927 in distribution liabilities to DKEPA #30 in D&K's accounts, liabilities which had accrued via actual cash transfers from KSN to D&K.

83. As a DKEPA #30 Member, Rogers only received distributions in actual cash in 2011 ($50,000), 2012 ($25,000), and 2016 ($15,000), for a total of $90,000.

84. This would mean that since 2007, KSN has only distributed $360,000 to DKEPA #30, less than the amount paid to Donatelli and each Gragg Member in 2011 alone, despite DKEPA #30 holding the largest membership interest, at 40%.

85. KSN distributed actual cash to its Members (including and especially Donatelli) each year of 2011 through 2014, as well as 2016 and 2017, but to DKEPA #30 only in 2011, 2012, and 2016. On information and belief, KSN may have made distributions to the non-DKEPA #30 Members every year of its operations since 2008.

86. Despite this drain on Operating Cash Flow, KSN recognized income, so as to cause its Members and DKEPA #30's Members to incur income tax liability. Because of this unreasonable drain on cash and KSN's unequal distributions, Donatelli violated the KSN Agreement § 4.1.1 provision requiring reasonable efforts to distribute Operating Cash Flow to cover income tax.

87. On information and belief, Donatelli has further deprived KSN of Operating Cash Flow, to which KSN's Members would be entitled as distributions, through the loss of at least $300,000 in rental and sale income for the 41 commercial parking spaces included in the Property.

88. On information and belief, numerous monthly payments for rental from commercial lessees on these parking spaces never entered KSN's cash accounts and/or its

accounting records for income. Neither have the proceeds on the sale of 8 parking spaces sold between 2007 and 2018.

89. On information and belief, KSN further obtained cash from the loans it received from TD Bank, United Bank, and Sandy Spring Bank, which constituted Net Financing Proceeds but which Donatelli made no effort, as Manager, to distribute. Or if he did distribute these proceeds, DKEPA #30 (and hence, Rogers) never received them.

90. Such Net Financing Proceeds include *at least*:

- TD Bank – $287,514.01 (explicitly described in the loan Settlement Statement as "New Money")
- United Bank – $187,203.28
- Sandy Spring – $316,522.23

*B. KSN Designated Cash Transfers as Distributions to DKEPA #30 Which Donatelli Transferred to Other Purposes.*

91. Under Donatelli's management, KSN did more than make numerous distributions to Donatelli and Nigel and Vance Gragg that it did not match with distributions to DKEPA #30. KSN also made cash outlays that it described as DKEPA #30 distributions in its accounts, but which DKEPA #30 never received.

92. On information belief, between September and October 2016, KSN disposed of at least $385,000 of the proceeds from the 2016 loan from James McReady to D&K and accounted for it by debiting the "2016 Distributions to Partners" account of KSN's balance sheet with the description "DKEPA (TRSF to D&K)."

93. DKEPA #30 never received these cash proceeds.

94. On information and belief, KSN reported this outlay as a distribution to DKEPA #30 in its 2016 tax return because DKEPA #30's account balance for "Distribution Due" increased the same year by more than that amount.

95. But this was not an amount that could possibly be faithfully accounted for or reported as a DKEPA #30 distribution. It could not have been a cash distribution because it did not reach DKEPA #30's accounts as cash, and it could not have been a distribution receivable because cash was available there and then (and because there was no genuine intent to pay it). This was plain and simple extraction of cash and then false accounting and reporting of it.

96. On information and belief, D&K and KSN both maintained liability balances over the years in their balance sheets for distributions due to DKEPA #30. But these liabilities were false accountings, as Donatelli (the controller of all the related entities) never had any intent for this money to be distributed. (It makes no sense for D&K to have maintained such a balance, as DKEPA #30 was not a member of D&K.)

97. All the same, at or about year-end 2017, D&K canceled approximately $1,078,927 of that liability to DKEPA #30, establishing that there was no such intent to repay.

98. Under Donatelli's control, DKEPA #30 recognized this as a loss as a bad debt. This loss caused the capital value of DKEPA #30 interests, such as that of Rogers, to decline proportionately.

99. Because Donatelli was on both sides of every relevant transaction, this cancellation and/or the assets receivable for based on the cancelled balance must have been falsely recognized in DKEPA #30's tax returns.[1]

---

[1] *See, e.g.*, *Topic no. 453, Bad debt deduction*, I.R.S. (Jan. 30, 2024), https://www.irs.gov/taxtopics/tc453 ("For a bad debt, you must show that at the time of the transaction you intended to make a loan and not a gift. If you lend money to a relative or friend with the understanding the relative or friend may not repay it, you must consider it as a gift and not as a loan, and you may not deduct it as a bad debt. . . . . To show that a debt is worthless, you must establish that you've taken reasonable steps to collect the debt.").

## IV. Discovery of the Misconduct

100. Rogers discovered all of these goings on in early 2023, upon receipt of a tax form K-1 from DKEPA #30, which showed project income of $17,000 but no covering cash distribution.

101. Rogers contacted D&K's corporate CPA, Nancy Singer, to ask why this was the case. Ms. Singer responded that KSN was in over-leveraged financial condition, and there would thus be no distribution. She further stated in a later conversation that, as a CPA, she could not falsify documents "the way some people around here can."

102. If Rogers had made such an inquiry in a prior year, there is no reason to believe he would have received the same alarming response, which spurred him to investigation.

103. There was no way for Rogers to discover the full breadth of the facts recounted in this complaint without investigation.

104. Rogers could not have known about the recurring re-financings and conflicted loans, nor the substantial outflows for no business purpose, from his own available information. Based only on his own and DKEPA #30's tax returns, there was no way to know of the amounts of distributions made to other KSN Members but not to DKEPA #30.

105. Rogers is not a direct owner of KSN, he is a Member of an employee participation account invested in KSN, which relies on Donatelli's faithful and accurate reports to the KSN Members.

106. Donatelli's intent to conceal all of the foregoing information about the actual financial condition and transactional goings-on at KSN is evident from the constant shell-game of outlays he played as the controlling person of all the entities. The false accounting of liabilities and receivables, purportedly based on distributions, further demonstrates that intent.

107. Moreover, on or about April 24, 2023, Rogers directly addressed the matter of the uncovered DKEPA #30 income with Donatelli shortly after his outreach to Ms. Singer. Donatelli responded that he had "heard something about that" and that he would "look into it." Donatelli did not follow up with Rogers on the matter.

108. Of course, as the Manager and the individual who controlled every relevant transaction, Donatelli knew exactly the cause of the drains on KSN cash flow which, despite the reportable income, had deprived DKEPA #30 of distributions. There would be no reason for such an obtuse response if there had been no intent to conceal these facts.

**COUNT I**
**(Fraud)**

109. Rogers adopts the allegations set forth in paragraphs 1-108 as if fully set forth herein.

110. Donatelli failed to disclose material information to DKEPA #30 Members such as Rogers in Donatelli's roles as KSN Manager and DKEPA #30 Manager.

111. Under District of Columbia law, a material misrepresentation may arise from a failure disclose material information which one has a duty to disclose, as well as making communications of false information.

112. As the Manager of KSN, Donatelli had a duty to disclose to all Interest Holders material information regarding KSN's accounts.

113. As only KSN Members had a right of direct access to KSN's books and records, a non-Member Interest Holder (such as Rogers) relied on information as provided and withheld by Donatelli.

114. As the Manager of DKEPA #30, Donatelli had a duty to disclose information Donatelli had about the financial health of DKEPA #30's sole asset to Rogers, a Member of DKEPA #30.

115. Donatelli further had a duty to disclose information concerning distributions by KSN to non-DKEPA #30 KSN Interest Holders, which would not have been apparent to Rogers based on the DKEPA #30 tax returns or accounts.

116. The manner in which numerous distributions were accounted for and reported constituted concealment of this information.

117. When Rogers sought information from about DKEPA #30's income, Donatelli continued to conceal his knowledge of material facts by saying that he had "heard something about that" and would "look into it," and by disclosing no information in follow-up.

118. Donatelli knew these material facts not disclosed and intended to deceive KSN's Interest Holders, especially the DKEPA #30 Members, including Rogers.

119. Rogers was only able to discover such information recently, upon investigation beginning in 2023. His roles as a D&K employee and DKEPA #30 Member provided him no constructive knowledge of the intricacies of KSN's accounts.

120. The uncompensated liabilities, illicit cash outflows, false distributions, and disproportionate distributions of KSN, directed by Donatelli over the life of KSN, are of the same scale as KSN's entire, most recent approximate asset appraisal. Information about these transactions would certainly have been material to Rogers.

121. Rogers relied on the belief fostered by Donatelli that Donatelli had managed KSN in a dutiful, straightforward fashion by continuing to accept his DKEPA #30 Member's interest as compensation for his work and continuing his interest in DKEPA #30 and KSN. If not for

Donatelli's misrepresentations, Rogers would have withdrawn his interests long ago and sought typical salary increases or new employment.

122. As a DKEPA #30 Member and KSN Interest Holder, Rogers has suffered monetary damages by the loss of millions of dollars in potential distributions, uncompensated income tax liabilities, and capital value in his DKEPA #30 interest as a result of this fraudulent inducement.

**COUNT II**
**(Promissory Fraud)**

123. Rogers adopts the allegations set forth in paragraphs 1-108 as if fully set forth herein.

124. On information and belief, Donatelli entered into the KSN Agreement with KSN's Members, including DKEPA #30, with no present intention of carrying out his promises and contractual obligations therein.

125. Donatelli knowingly concealed his intent by outwardly agreeing to the KSN Agreement's terms of which he was aware.

126. Had Rogers, as a DKEPA #30 Member, known of Donatelli's fraudulent intent, he would not have consented to DKEPA #30 entering into the KSN Agreement.

127. As a DKEPA #30 Member and KSN Interest Holder, Rogers has suffered monetary damages by the loss of millions of dollars in potential distributions, uncompensated income tax liabilities, and capital value in his DKEPA #30 interest as a result of this fraudulent inducement.

**COUNT III**
**(Breach of Contract)**

128. Rogers adopts the allegations set forth in paragraphs 1-108 as if fully set forth herein.

129. As a signatory to the KSN Agreement and the appointed Manager of the Agreement, Donatelli caused KSN to dispense numerous distributions to KSN Interest Holders out of proportion to their respective interests, in violation of KSN Agreement § 4.1.1.

130. KSN Agreement § 4.1.1 further required the Manager to "use all reasonable efforts to distribute enough Operating Cash Flow on an annual basis to cover the income tax obligations of the Members for such year that arises as a result of the allocation of any items of income or gain to the Members based on their Interests in the Company."

131. Donatelli repeatedly failed to distribute sufficient cash to DKEPA #30 for those Interest Holders to cover income tax liabilities, either because his actions deprived KSN of cash or despite the availability of such cash, in violation of KSN Agreement § 4.1.1.

132. As a signatory to the KSN Agreement and the appointed Manager of the Agreement, Donatelli caused KSN to incur millions of dollars of debt in violation of the single purpose entity provisions of KSN Agreement § 2.3.

133. As a signatory to the KSN Agreement and the appointed Manager of the Agreement, Donatelli caused KSN to dispense millions of dollars in cash to related entities with no business purpose benefiting KSN, in violation of the single purpose entity provisions of KSN Agreement § 2.3.

134. As a KSN Interest Holder, Rogers has suffered monetary damages by the loss of millions of dollars in potential distributions, uncompensated income tax liabilities, and capital value in his DKEPA #30 interest as a result of this breach of contract.

**COUNT IV**
**(Conversion)**

135. Rogers adopts the allegations set forth in paragraphs 1-108 as if fully set forth herein.

136. On information and belief, since 2007, Donatelli has diverted at least $300,000 in revenue from the lease and sale of KSN-owned parking spaces to himself and/or other ventures he owns or controls.

137. The cash described above in this claim constituted specific, identifiable funds to which KSN and its Interest Holders had a property right, which Donatelli diverted to his own uses.

138. As a KSN Interest Holder, Rogers has suffered monetary damages of proportionate to his interest as a result of this conversion.

**COUNT V**
**(D.C. Code § 29-808.01 – Breach of Fiduciary Duty of Loyalty)**

139. Rogers adopts the allegations set forth in paragraphs 1-108 as if fully set forth herein.

140. As the Manager of DKEPA #30, Donatelli owed a fiduciary duty of loyalty to DKEPA #30's Members, which included to refrain from dealing with the company in the conduct of the company's activities and affairs as or on behalf of a person having an interest adverse to the company.

141. Every transaction DKEPA #30 entered into was with an entity Donatelli also controlled. Such transactions were always to the benefit of Donatelli alone.

142. In certain years, Donatelli caused DKEPA #30 to recognize income, because of fabricated assets receivable from entities he controlled where no intent to repay existed, while failing to distribute cash from KSN sufficient to cover such income. This caused DKEPA #30 Members to incur income tax liabilities without actual cash from DKEPA #30's interest holdings sufficient to cover them.

143. By repeatedly making accounting transactions to DKEPA #30's detriment, where Donatelli controlled the entity on the other side of the transaction, and by deceiving DKEPA #30's

Members as to the financial condition of an asset entity which he also controlled, Donatelli failed this duty.

144. As a DKEPA #30 Member, Rogers has suffered direct monetary damages by the loss of millions of dollars in potential distributions, uncompensated income tax liabilities, and capital value in his interest as a result of these breaches of fiduciary duty.

**COUNT VI**
**(D.C. Code § 29-808.01 – Breach of Fiduciary Duty of Care)**

145. Rogers adopts the allegations set forth in paragraphs 1-108 as if fully set forth herein.

146. As the Manager of KSN, Donatelli owed a fiduciary duty of care to DKEPA #30's Members and Interest Holders.

147. On information and belief, Donatelli caused DKEPA #30 to commit knowing violations of the law through the filing of false tax returns, for which DKEPA #30 may have incurred legal liability.

148. As a Member of DKEPA #30, Rogers has suffered monetary damages by risk of liability to which such conduct subjects DKEPA #30, resulting from these breaches of fiduciary duty.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

A. For a judgment against Defendant.

B. For an award of damages in an amount not less than $1.918 million.

C. For mandatory injunctive relief directing the buyback of Plaintiff's KSN interest.

D. For attorneys' fees and costs.

E. For such other, further, or different relief as this Court may deem just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury for all applicable claims.

DATED: April 30, 2024

WARD & BERRY, PLLC

By: ______________________________

DANIEL S. WARD, DC Bar No. 474339
BRIAN S. YU, DC Bar No. 1645288
dan@wardberry.com
brian@wardberry.com
1751 Pinnacle Drive
Suite 900
Tysons, VA 22102
(202) 331-8160
(202) 505-7100 (Fax)

Attorneys for BRIAN A. ROGERS